**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NAHUM GILBERTO ORTIZ; DENNY MOLINA CANTOR; LUCAS PALACIOS ALVARADO; JEREMIAS LOPEZ LOPEZ; ELMER MOSCOSO GUERRA; and LUIS GONZALEZ CARBAJAL, <br><br> Plaintiffs, <br><br> v. <br><br> ORANGE COUNTY, NEW YORK; PAUL ARTETA, Sheriff of Orange County, in his official and individual capacity; CARL DUBOIS, former Sheriff of Orange County, in his individual capacity; KENNETH JONES, former Undersheriff of Orange County, in his individual capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and KENNETH GENALO, Acting ICE Field Office Director, in his official capacity, <br><br> Defendants. | Case No. 23-cv-2802 <br><br><br> **COMPLAINT AND** <u>**DEMAND FOR JURY TRIAL**</u> |

## INTRODUCTION

1.     This civil-rights action challenges far-reaching efforts by government officials to silence and punish criticism by immigrants in detention about the dangerous and inhumane conditions that have persisted in the second largest immigration detention facility in New York State.

2.     For over a decade, Orange County, acting under an agreement with U.S. Immigration and Customs Enforcement ("ICE"), has held thousands of people in civil detention

at the Orange County Jail ("OCJ") pending the outcome of their months- and sometimes years-long immigration proceedings.

3.    In frequent public statements, jail officials have extolled the successful—and revenue generating—nature of the county's relationship with ICE. But the reality for those detained behind OCJ's razor-wire fences has been an environment marked by deprivation and abject suffering. Assaults and racist verbal abuse by staff run rampant. Basic medical and mental healthcare are frequently delayed or denied altogether. Inedible meals comprised of rancid meat have been the norm. Access to immigration counsel is often non-existent.

4.    The plaintiffs know these deplorable conditions well. They are six individuals who are or recently were confined to immigration detention at OCJ. They were incarcerated for months—most of them, well over a year—in immigration detention in Orange County, where they each have endured abuse, racist mistreatment and neglect by jail officials.

5.    In 2021, the plaintiffs, alongside dozens of others detained at OCJ, began collective efforts to speak out about the conditions at the jail. With the shared goal of exposing the defendants' misconduct, they filed grievances and administrative complaints and contacted elected officials, reporters, and advocates. In February 2022, these efforts culminated in a multiday hunger strike in which the plaintiffs and others—peacefully, but resolutely—refused the meal trays brought to their cells.

6.    Embarrassed by the media's coverage of the hunger strike, and the underlying terrible conditions that motivated it, the defendants responded to these efforts with swift and crushing retribution. Immediately after the hunger strike began, jail guards isolated the hunger strikers by placing them in segregated confinement and disabling their ability to send messages to people outside of the jail. The guards then "searched" the cells of the plaintiffs and the other

hunger strikers en masse, confiscating and destroying their belongings, including towels, clothing, commissary food, and bedding. Within days, OCJ officials issued disciplinary citations against almost every hunger striker, assigning each of them additional time in segregated confinement.

7.     Despite being fearful of further retaliation, the plaintiffs continued their advocacy, including by filing additional complaints with the Department of Homeland Security and testifying before the New York City Council.

8.     Defendant Kenneth Jones, then-undersheriff of Orange County, publicly warned that the complaints about the jail would result in the plaintiffs' transfer by ICE to detention facilities far from their families. Defendant Jones, together with the then-sheriff, Defendant Carl DuBois, ensured that this threat came true. In July 2022, after months of the plaintiffs' continued self-advocacy, ICE agents arrived at OCJ, at Orange County's request, and transported a large group of the hunger strikers, including Plaintiffs Molina and Palacios, to a detention facility in Natchez, Mississippi. On or about March 16, 2023, Plaintiffs Molina and Palacios were again transferred to facilities in Louisiana. They continue to be separated by thousands of miles from their young children and immigration counsel in New York. Both retaliatory transfers were authorized and executed by ICE in violation of the agency's own policy against such transfers.

9.     On the same day that Plaintiffs Molina and Palacios were transferred to Mississippi, OCJ officials abruptly moved a second group of hunger strikers, including Plaintiffs Ortiz, Lopez, and Moscoso, to a filthy, cramped, and previously defunct punitive segregation unit within the jail, where Plaintiffs Lopez and Moscoso remain under the authority of the current sheriff, Defendant Paul Arteta.

10.     The plaintiffs seek to raise public awareness about the punitive and degrading treatment and conditions they have endured in immigration detention at OCJ free from the fear of governmental retaliation. The Constitution and federal law give the plaintiffs that right.

11.     The plaintiffs bring this Section 1983 action under the First Amendment for the defendants' unlawful retaliation against them. They seek declaratory relief and compensatory damages. In addition, Plaintiffs Moscoso and Lopez seek release from punitive segregation, while Plaintiffs Molina and Palacios seek a return to the New York area. Plaintiffs Molina and Palacios bring additional claims for declaratory and injunctive relief under the Administrative Procedure Act for Defendant ICE's violation of its own transfer policies.

## PARTIES

*Plaintiffs*

12.     Plaintiff Nahum Gilberto Ortiz was incarcerated by ICE at OCJ for 17 months from September 28, 2021, to March 8, 2023. He was released from detention after the government agreed to provide him with a custody hearing following a habeas petition. Plaintiff Ortiz has parents, siblings, and a U.S. citizen daughter in the New York area. Since his release, Plaintiff Ortiz has returned to Long Island where his family has resided since 1998.

13.     Plaintiff Denny Molina Cantor has been incarcerated by ICE since November 2021 under 8 U.S.C. § 1226(a). He was detained at OCJ between November 2021 and July 2022, at which point he was transferred to Adams County Correctional Center ("Adams") in Natchez, Mississippi. On or about March 16, 2023, Plaintiff Molina was transferred to Pine Prairie ICE Processing Center ("Pine Prairie") in Pine Prairie, Louisiana, where he remains detained. He has four siblings, a daughter, a stepmother, a great aunt, aunts, uncles, and cousins in the New York area. He is represented in his immigration and bond proceedings by attorneys at Brooklyn Defender Services in Brooklyn, New York.

4

14.     Plaintiff Lucas Palacios Alvarado has been incarcerated by ICE since August 2021 under 8 U.S.C. § 1226(a). He was incarcerated at OCJ from August 2021 to July 2022, at which point he was transferred to Adams in Natchez, Mississippi. On or about March 16, 2023, Plaintiff Palacios was transferred to Winn Correctional Center ("Winn") in Winnfield, Louisiana, where he remains detained. His parents, younger siblings, and 8-year-old son are all in the New York area. He is represented in his immigration proceedings by a private attorney who is based in New York City.

15.     Plaintiff Jeremias Lopez Lopez has been incarcerated by ICE at OCJ since August 2021. Prior to his incarceration, Plaintiff Lopez lived in Spring Valley, New York.

16.     Plaintiff Elmer Moscoso Guerra has been incarcerated by ICE since November 2021. He has been held at OCJ for the majority of his detention. Prior to his detention, Plaintiff Moscoso lived in Roosevelt, New York.

17.     Plaintiff Luis Gonzalez Carbajal was incarcerated for over two years from approximately May 14, 2020, to August 8, 2022. He had been incarcerated in pretrial criminal detention at OCJ in May 2020, until his transfer to ICE custody on February 25, 2021. Plaintiff Gonzalez was released from detention on August 8, 2022, after the government agreed to provide him with a custody hearing following a habeas petition.  He has since returned to his home in the Newburgh, New York area, where he has lived for the past 23 years.

### Defendants

18.     Defendant Orange County is a municipal entity created and organized under the laws of the State of New York. Through its senior officials, including the Sheriff and Undersheriff, who hold final policymaking authority for the County, it maintains and operates

OCJ, located in Goshen, New York. OCJ incarcerates people in criminal pretrial proceedings, people serving criminal sentences, and people in civil immigration detention.

19.     Defendant Paul Arteta is the Sheriff of Orange County and has held that role since January 1, 2023. As Sheriff, Arteta is responsible for the administration of OCJ, including ensuring the safety of detained persons and administering punishment. Defendant Arteta has directed, ratified, and/or is deliberately indifferent to the ongoing retaliation that the plaintiffs faced and continue to face. At all relevant times during his tenure as Sheriff, Defendant Arteta has acted under color of state law. Defendant Arteta is named in his official and individual capacity.

20.     Defendant Carl DuBois was the Sheriff of Orange County from January 1, 2003, to December 31, 2022. As Sheriff, DuBois was responsible for the administration of OCJ, including ensuring the safety of detained persons and administering punishment. Defendant DuBois supervised Defendant Jones. Defendant DuBois directed, ratified, and/or was deliberately indifferent to the retaliation that the plaintiffs faced. At all relevant times during his tenure as Sheriff, Defendant DuBois acted under color of state law. Defendant DuBois is named in his individual capacity.

21.     Defendant Kenneth Jones was the Undersheriff of Orange County from January 3, 2003, to December 31, 2022. Defendant Jones was responsible for the administration of OCJ, including ensuring the safety of detained persons, administering punishment, and administering Orange County's contracts with ICE. Defendant Jones directed, ratified, and/or was deliberately indifferent to the retaliation that the plaintiffs faced. At all relevant times during his tenure as Undersheriff, Defendant Jones acted under color of state law. He is named in his individual capacity.

22.     Defendant U.S. Department of Homeland Security ("DHS") is an executive department of the United States Government headquartered in Washington, D.C. DHS is the parent agency of ICE.

23.     Defendant ICE is a component agency of DHS and is responsible for enforcing federal immigration law, including by detaining and deporting immigrants. ICE discharges its responsibility for incarceration of immigrants by promulgating detention standards to be followed in the facilities in which immigrants are held pending removal hearings, and contracting with government entities, including OCJ, and private corporations that operate detention facilities.

24.     Defendant Kenneth Genalo is the Acting Director of ICE's New York Field Office located in New York, New York. In that role, he is responsible for the enforcement of the immigration laws in New York City and surrounding counties within New York. Defendant Genalo has been responsible for the conditions of each plaintiff's confinement during the periods when their immigration cases were supervised by the New York Field Office. Defendant Genalo is named in his official capacity.

## FACTUAL ALLEGATIONS

### Orange County Agrees to Incarcerate Noncitizens on Behalf of ICE.

25.     The United States operates the largest immigration detention system in the world, with over 100 facilities throughout the country; the system holds up to 50,000 people per day while they await, for months or even years, a final determination in their removal proceedings or potential deportation. The mass-detention system imprisons a wide range of immigrants, including people seeking asylum, survivors of torture, lawful permanent residents, and other people with lawful status who have lived in the United States for decades. Many detained

7

immigrants have children or spouses who are U.S. citizens. Many have medical and mental-health conditions that are only exacerbated by their detention.

26.     Most ICE detention facilities are operated through contracts with for-profit prison companies, local jails and governments, and state prisons. OCJ, where the plaintiffs either were or continue to be incarcerated, detains people on behalf of ICE pursuant to one such contract.[1] This intergovernmental service agreement with ICE, which has been in place since 2008, requires that the federal government pay OCJ on a per-detained person, per-diem basis. In 2021, ICE paid OCJ a total of $4.98 million, nearly $134 per detained person per day.

27.     In exchange for ICE's flat per-person, per-diem payment, OCJ is responsible for the costs associated with detaining that person, including their food and healthcare. To maximize the profit that OCJ recoups from immigration detention, OCJ is incentivized to limit spending on basic health and safety measures for detained persons. When Orange County entered into the contract with ICE in 2008, Defendant Dubois' goals were clear: minimize costs, deposit the revenue into the county's general fund, and "cycl[e] some of that money back into law enforcement"—perhaps for an indoor firing range. In speaking about the costs the jail would have to expend on immigration detention, Defendant Dubois said, "It won't even put a dent in what we're going to take in." The people detained at the jail have suffered the consequences of OCJ's failure to expend the necessary resources on their safety and health.

28.     Approximately 320 people are currently incarcerated at OCJ, including those whose detention relates to criminal charges, and the average daily population of those held in

---

[1] Plaintiffs Ortiz, Lopez, Moscoso, and Gonzalez's immigration cases are supervised by the New York Field Office; Plaintiffs Molina and Palacios' immigration cases were supervised by the New York Field Office until approximately March 16, 2023, when they were transferred to facilities in Louisiana.

federal immigration custody at OCJ since September 2022 is about 80. Upon information and belief, the jail is divided into wings with alphabetic designations (A, B, C, and D), and sub-divided into units with numerical designations (A1, B2, D3, etc.). Unit A3, where most of the plaintiffs were detained, has 56 cells on two levels.

29.     Conditions at OCJ are under the direct control of the Orange County Sheriff, who is the chief law enforcement officer for the County and, by local law, is the "keeper of the County jail."[2] The Sheriff's office is physically located at OCJ. The Sheriff has broad authority on law enforcement and jail-related matters, including the transport of persons within the Sheriff's custody.[3] From January 1, 2003, to December 31, 2022, Defendant DuBois served as the Orange County Sheriff, at which time Defendant Arteta succeeded him as Sheriff.

30.     Defendant Jones, the Undersheriff during Defendant DuBois's tenure, exercised control over the conditions of immigration detention at OCJ. Defendant Jones's office was also physically located at OCJ. As part of his job description, Defendant Jones oversaw and directed management and implementation of Orange County's contracts with ICE and oversaw all operational aspects of the Sheriff's Office. During his tenure, Defendant Jones signed all modifications to the contract between ICE and OCJ, binding the county to detain people at OCJ for the federal government. Defendant Jones frequently testified before Orange County's Public Safety and Emergency Service Committee on behalf of OCJ about the ICE contract and immigration detention at OCJ. When city councilmembers and journalists visited the jail in 2022, Defendant Jones escorted them throughout OCJ and responded to their questions about the conditions of immigration detention at OCJ.

---

[2] Orange County Code § 17-2.

[3] Orange County Code §17-2; *id.* § 17-5.

31.     ICE is responsible for ensuring that its contracted facilities such as OCJ comply with minimum detention standards. ICE operates its vast detention network through a set of various detention standards, each of which apply to different categories of facilities. ICE's 2019 national detention standards for non-dedicated facilities govern OCJ. These standards are intended to ensure detained people "are treated humanely; protected from harm; provided appropriate medical and mental-health care; and receive the rights and protections to which they are entitled." The standards prohibit disciplinary retaliation, including for "lodging a complaint"; place limits on the use of segregation; and require continuous access to legal visitation and mail. Notably, the standards also require an annual hunger-strike training. In both November 2021 and May 2022, ICE's Office of Detention Oversight found OCJ to be noncompliant with this training requirement.

### The Plaintiffs Have Been Subjected to Degrading Conditions and Continual Mistreatment While Incarcerated at OCJ.

32.     People in immigration detention at OCJ have regularly complained about unlivable conditions and mistreatment at the facility. During their incarceration, they experience complete restriction of their freedom; they have had limited access to outdoor recreation, have been subject to segregation and other forms of harsh punishment, and have limitations placed on phone access, visitation, and correspondence.

33.     In 2018, DHS's Office for Civil Rights and Civil Liberties investigated "numerous allegations of civil rights and civil liberties violations involving detainees at OCJ," including the death of a detained person, identifying multiple concerns regarding the "medical care, environmental health and safety, and overall conditions at the facility." In recent years, detained people, politicians, journalists and advocates have raised concerns about the adequacy

of medical and mental-health care, the endemic racism, abuse, retaliation by guards, and the inedible and insufficient food.

34.     Despite the vital importance of access to medical and mental-health care in carceral settings, the frequent practice at OCJ is to delay access to basic treatment, or to deny access altogether. Just two weeks before the filing of this complaint, people detained at the jail and advocate groups filed a complaint with the DHS's Office for Civil Rights and Civil Liberties, concerning, *inter alia*, a pattern and practice of medical neglect at OCJ.

35.     The plaintiffs experienced this neglect firsthand during their lengthy incarcerations. The jail has repeatedly denied the plaintiffs mental-health care. For example, when Plaintiff Molina began experiencing auditory hallucinations, jail staff ignored his request to see a psychiatrist for weeks. And it took months for OCJ to provide Plaintiff Molina with the psychiatric medication he was prescribed prior to detention, despite Plaintiff Molina's repeated requests for the medication.

36.     When Plaintiff Moscoso began experiencing severe symptoms of depression following the tragic passing of his mother from COVID-19, jail staff refused his requests for mental-health treatment, citing the unavailability of Spanish-speaking therapists. Instead, staff provided Plaintiff Moscoso with a piece of paper: a generic fact sheet about depression.

37.     Throughout Plaintiff Gonzalez's detention at OCJ, jail staff denied Plaintiff Gonzalez reliable access to treatment for Post-Traumatic Stress Disorder, treating his mental health care needs dismissively and with contempt. Staff provided Plaintiff Gonzalez his prescribed medication for PTSD only sporadically and in inconsistent dosages, resulting in frequent, severe side effects. And on one occasion, a healthcare worker tore up his medication dosage instructions in Plaintiff Gonzalez's face while laughing at him.

38.     OCJ has also denied medical care relating to the plaintiffs' chronic conditions. Plaintiff Palacios requested preventative medical screening for cholesterol and blood sugar levels but was denied treatment by the OCJ officials. When he was admitted to OCJ, Plaintiff Palacios was only provided a COVID-19 screening instead of the full physical screening required by ICE's detention standards.

39.     Plaintiff Ortiz entered OCJ with a chronic injury resulting from ruptured discs in his back. Despite repeated, frequent requests for pain medication and a backstrap, it took the jail over 10 months to provide these necessities.

40.     Even with respect to acute medical needs, OCJ's routine practice has been to delay or deny treatment, exposing the plaintiffs and others in the jail's custody to risk of serious medical complications and potentially life-threatening harm.

41.     During an incident of severe food poisoning in or about October 2022, OCJ officials refused to provide treatment to Plaintiff Lopez, citing a supposed lack of an emergency. Previous requests for medical care by Plaintiff Lopez were ignored and then delayed by weeks. Plaintiff Lopez frequently experiences concerning symptoms, including frequent headaches, nausea, fatigue, and dizzy spells. OCJ officials only provided Plaintiff Lopez with over-the-counter medications, such as Tylenol and antacids, to treat his headaches and nausea, with minimal effect, and did not conduct follow-up testing to identify the cause of these continued symptoms.

42.     During one COVID-19 outbreak in the facility, Plaintiff Moscoso became ill and requested to be tested and evaluated for care given a history of high blood pressure and pain; OCJ healthcare staff took approximately nine days to see him and three additional days to authorize Motrin.

43.     Staff at OCJ also routinely subjected detained persons, including the plaintiffs, to racist and xenophobic harassment. Various OCJ guards repeatedly told detained people to "go back to their own countries." Speaking Spanish led to reprimands and aggression. Black immigrants were reportedly called the N-word, and one officer talked about "how dark people's skin is" and said openly that "Africans have a certain kind of smell." Guards said that immigrants "don't deserve respect."

44.     The plaintiffs experienced this xenophobic harassment firsthand. Officer Richard Bloise (Badge No. 366) called him racial epithets in Spanish like "pinche mexicano" and "pinche animal." Multiple officers told Plaintiff Gonzalez that they "would have killed" him if they had encountered him at the border. Officer Bloise stopped a person from entering a room Plaintiff Ortiz was in and said, loudly, "Oh wait, there's a Spanish dude in there. He might have a machete." Later, while detained persons, including Plaintiff Ortiz, were ordering commissary, Officer Bloise loudly said, "Don't forget to order your rice and beans." Plaintiff Molina observed that detained immigrants who are white and English speaking received better treatment than Spanish-speakers like himself did.

45.     This harassment reflects a broader culture at the jail that is tolerant of such views. Defendant Jones was a member of the Oath Keepers in 2013 and 2014, while undersheriff, at a time when the extremist group described immigrants as "[f]oreign invaders" and "illegal[s]." In 2015, Defendant Jones publicly endorsed annexing New York City away from the state "so the rest of the state couldn't be a sanctuary for illegal aliens." Defendant Jones has acknowledged reports that public records connect Officer Bloise to email accounts with the handle "nazikommando." Sergeant Daniel Figueroa, who also frequently interacted with the plaintiffs

and other detained persons, shared social-media posts suggesting that immigrants carry disease and were "hostile, free loading assholes."

46.     Finally, people detained at OCJ have long complained about the inadequate quantity and quality of the food they are served. OCJ has served the plaintiffs foul-smelling, rotten food on multiple occasions. OCJ's food has caused frequent and widespread food poisoning and indigestion for the persons detained at OCJ. Detained people at OCJ have described the food as inedible and unhealthy. They have experienced and continue to experience nausea, diarrhea, or constipation from the food. Some of the plaintiffs have had to take medication to deal with the gastrointestinal problems created by the food.

### The Defendants Ignore the Plaintiffs' Grievances.

47.     Throughout their detention, the plaintiffs have tried to raise these problems formally and informally with OCJ and ICE. Their complaints were ignored. When the plaintiffs complained to the guards or asked for clothes and other necessities, the guards would pretend not to hear them or say it was not their problem. On several occasions, Plaintiff Palacios and others complained about the food but were told by the OCJ guards, "If you don't like the food, then buy commissary."

48.     The plaintiffs also attempted to file formal grievances with OCJ. In order to file grievances in the lockbox provided at OCJ, detained people must first obtain a formal grievance form. Plaintiff Ortiz repeatedly asked for these grievance forms, but the OCJ guards refused to provide them. Once, when Plaintiff Ortiz asked to submit a grievance, he was taken to the sergeant, who asked him what his grievance was about. When he told the sergeant that he wanted to grieve the behavior of an officer, the sergeant refused to give him the grievance form. On another occasion, when Plaintiff Ortiz said that he did not want to tell the sergeant the subject of

his grievance, the sergeant told him to return to his cell and to wait for paperwork to be delivered; it never came.

49.     In approximately September 2021, Plaintiff Gonzalez submitted formal written grievances through OCJ's internal lockbox system about Officers Bloise and Lattimer for their racism, threats of violence, and verbal abuse. Following these grievances, several guards told Plaintiff Gonzalez that they "did not have to pay attention" to the grievance. OCJ conducted a limited "investigation" into Plaintiff Gonzalez's grievances by telling each of the officers he complained about exactly what Plaintiff Gonzalez had said – which likely increased the retaliation against him. Upon information and belief, OCJ did not discipline those officers or take any meaningful corrective action to address Plaintiff Gonzalez's grievances.

50.     Others chose not to file grievances out of fear the guards would retaliate. Plaintiff Lopez witnessed OCJ guards retaliate against people who file grievances, including by finding any excuse to put them in segregated confinement and reporting alleged misbehavior to the immigration court to damage their case. As a result, he does not report abusive guards.

51.     At other times, the plaintiffs tried to raise concerns with OCJ but were told to complain about their mistreatment to ICE. But, despite numerous efforts, the plaintiffs were almost always unable to speak with ICE officials about the substance of their concerns. Although ICE officials were required to make regular visits to OCJ, the officials often did not come or would only come during hours when plaintiffs were locked in their cells.

52.     Each housing unit at OCJ has a lockbox where complaints could be made directly to ICE, and the plaintiffs frequently made use of this box. For example, Plaintiff Ortiz submitted complaints about the food, the racist guards, and conditions through this box. However, for months at a time, ICE failed to respond to the complaints in the lockbox, and it was unclear to

the plaintiffs how—or even if—the complaints were being processed. When Plaintiff Molina

asked ICE to address their complaints, he was told to raise them with OCJ.

<b><u>The Defendants Retaliate Against the Plaintiffs<br>for Speaking Out About Conditions at OCJ.</u></b>

53.     The plaintiffs, among many others detained at OCJ, made several attempts to alert

the public to the dire conditions in OCJ during their prolonged incarcerations. During their

detention, they filed grievances; litigated habeas petitions; submitted complaints to ICE and

DHS; and spoke with journalists, advocates, and politicians about the conditions at OCJ.

54.     ICE's national detention standards state that "[s]taff will not harass, discipline,

punish, or disclose sensitive information about, or otherwise retaliate against a detainee lodging a

complaint." However, instead of responding to the substance of the plaintiffs' complaints and

providing the requisite care to people in their custody, the defendants attempted to silence the

plaintiffs, harassed them, and punished them by subjecting them to segregated confinement.

Facing public condemnation and additional complaints, the jail, in coordination with ICE, then

transferred the plaintiffs—two to Mississippi and the rest to punitive segregation within the

facility—further separating them from their family and counsel. This retaliation, ratified by

Defendants DuBois, Jones, and ICE, were an attempt to silence the plaintiffs' continued

advocacy.

***Plaintiff Gonzalez Engages in Sustained Advocacy and Experiences a Series of Retaliatory
Beatings and Punitive Confinement***

55.     In November 2021, Plaintiff Gonzalez submitted a complaint to DHS's Office for

Civil Rights and Civil Liberties, detailing retaliation, abuse, racism, hostile disregard of his

medical and mental-health needs, violations of his rights, and retaliatory use of solitary

confinement through medical isolation.

56.     As a result of the complaint, investigators from DHS visited OCJ and spoke with Plaintiff Gonzalez. After the investigators visited OCJ, the guards tried to intimidate Plaintiff Gonzalez by becoming more physically aggressive, commenting on his communications with DHS, and threatening to have him deported.

57.     Plaintiff Gonzalez also filed a complaint directly with the Orange County Sheriff's Office on December 1, 2021, requesting an investigation of medical practices, racist threats and verbal abuse, retaliation, and deplorable conditions at OCJ, including an investigation into wrongdoing by Officer Bloise, Officer Michael P. Lattimer, Sergeant Daniel Figueroa, Officer Ricardo Carde (Badge No. 523), and Sergeant Keith Conroy (Badge No. 117). Upon information and belief, OCJ did not investigate or take action to address Plaintiff Gonzalez's complaint.

58.     On December 2, 2021, Plaintiff Gonzalez was the subject of a news article and accompanying radio segment regarding the horrible conditions at OCJ. The article detailed the abusive and racist treatment of immigrants detained at OCJ, including the jail's failure to provide Plaintiff Gonzalez with necessary mental health treatment for his documented mental health issues. Although the story identified Plaintiff Gonzalez only by his initials, it includes quotes from Undersheriff Jones making clear he knew Plaintiff Gonzalez's identity. The next day, on December 3, 2021, Plaintiff Gonzalez was in the jail's medical unit when Officer Lattimer, who was one of the subjects of Plaintiff Gonzalez's complaint, came to the unit. Plaintiff Gonzalez asked Officer Lattimer to call the Sergeant, as he feared for his safety. In response, guards handcuffed Plaintiff Gonzalez and physically attacked him, documented in a use-of-force incident report. He was sentenced to 14 days of keeplock. Keeplock is a form of segregated

confinement in which people detained at OCJ are confined to their cells and only permitted to leave their cells usually for no more than four hours each day.

59.     Plaintiff Gonzalez was not the only detained person who raised concerns about Officer Bloise. Plaintiffs Molina and Palacios, among others, also complained to OCJ officials about Officer Bloise's abusive behavior. On January 1, 2022, a group of individuals, including some of the plaintiffs, demanded to speak to a sergeant about Officer Bloise's racist abuse and harassment. In response, approximately twenty officers responded with violence. The officers yelled insults at the men, shoving them towards their cells. Several officers then physically assaulted one of the men, handcuffed him and dragged him away while he cried for help. Furthermore, instead of addressing the group's effort to register a complaint against an abusive guard, OCJ officials issued disciplinary citations against them and imposed five days in segregated confinement.

60.     On February 5, 2022, after enduring months of targeted harassment by OCJ guards due to his advocacy and ongoing, untreated/undertreated mental-health needs, Plaintiff Gonzalez became upset when Officer Bloise came to his unit. Plaintiff Gonzalez asked another guard to ask Office Bloise to leave, afraid of further retaliation. When Officer Bloise began provoking him, Plaintiff Gonzalez threw water at the wall behind Officer Bloise. Then, at least seven OCJ guards threw Plaintiff Gonzalez to the ground and kicked, beat, and handcuffed him. One guard pinned Gonzalez to the ground with his knee against Gonzalez's head and neck. OCJ staff then assigned Plaintiff Gonzalez 20 days of segregated confinement. Plaintiff Gonzalez continues to suffer physical pain and limited mobility in his left shoulder from injuries inflicted by OCJ guards during this event.

***Plaintiffs Ortiz, Molina, and Gonzalez Participate in a Civil Rights Complaint to DHS.***

61.     In early to mid-February 2022, Plaintiffs Ortiz, Molina, and Gonzalez discussed their experiences at OCJ with advocates  e as part of a group complaint submitted by several immigrant and civil rights organizations to DHS's Office for Civil Rights and Civil Liberties ("February Civil Rights Complaint"). The February Civil Rights Complaint, filed with DHS on February 17, 2022, relies on the Plaintiffs Ortiz and Molina's sworn statements, among others, in detailing the following issues at OCJ: racism and religious discrimination; retaliatory physical violence and use of force; excessive, retaliatory, and punitive use of solitary confinement; medical neglect, abuse, and retaliatory withholding of care; mismanagement of the COVID-19 pandemic; abuse of power and culture of impunity; insufficient and inadequate food; delayed and surveilled communications, including with attorneys; and generally deplorable conditions.

62.     In particular, the February Civil Rights Complaint includes detailed accounts of guards at OCJ using retaliatory violence and disciplinary segregation against detained people who registered informal and formal complaints, including the January 1st and February 5th assaults detailed above. The complaint also raises other endemic issues at the jail including, *inter alia*, the racism and discrimination by guards, medical neglect, and inedible food.

63.     While the individuals who submitted information and declarations cited in the February Civil Rights Complaint used pseudonyms to protect against further retaliation, upon information and belief, officials at OCJ were able to identify those who participated based on the content of their information and declarations. For example, in denying certain allegations in the February Civil Rights Complaint to a reporter, Defendant Jones specifically and repeatedly mentioned the February 5 incident involving Plaintiff Gonzalez.

64.     The February Civil Rights Complaint received media attention and prompted scrutiny of OCJ from other governmental entities. The New York City Council's Committee on

Immigration issued notice that their February 28, 2022 hearing would inquire into conditions at OCJ and requested that OCJ officials testify. OCJ officials refused the request.

65.     The U.S. Attorney for the Southern District of New York's office also inquired into practices at OCJ in response to the February Civil Rights Complaint. The U.S. Attorney released a letter on February 23, 2022, stating, "The government takes allegations of abuse of detainees very seriously."[4]

66.     The New York State Attorney General's office also inquired into conditions at OCJ. On at least one occasion, Plaintiff Molina and Plaintiff Gonzalez spoke with a representative from the Civil Rights Bureau of the Attorney General's office about conditions at OCJ.

67.     As the February Civil Rights Complaint brought increased governmental attention to conditions at OCJ, the plaintiffs and other detained persons at OCJ continued their own personal advocacy from within the jail.

### The Plaintiffs Protest Mistreatment by Engaging in a Hunger Strike.

68.     On February 16, 2022, after each of their various attempts at advocacy failed to bring change to the facility, dozens of people, including each of the plaintiffs, engaged in a multiday hunger strike at OCJ to call attention to the abhorrent conditions at the jail. In doing so, they joined a historic tradition, widely regarded as an act of profound and peaceful protest, leveraging the only power that incarcerated persons have in systems of total control: their bodies.

---

[4] This letter also notes "that OCJ has moved two of the OCJ guards referenced in the February 17 CRCL Complaint outside of the ICE detainee unit." However, these guards have continued to work at OCJ and, to the plaintiffs' dismay, some of the guards mentioned in the complaint have recently returned to the ICE units where they are detained.

69.     The hunger strike involved a significant portion of the A3 unit in OCJ, including

Plaintiffs Moscoso, Lopez, Molina, Gonzalez, and Palacios, and several people in the A1 unit,

including Plaintiff Ortiz. The plaintiffs hoped to convince ICE and OCJ to remove the racist and

abusive guards, to improve access to medical and mental health treatment, and to provide them

with edible and nutritious food.

70.     On each day of the strike, the participants declined to take the tray of food

brought to their cells at mealtime. They sat peacefully in their cell during mealtimes, without

disrupting other detained people, guards, or any operations at OCJ. They obeyed all of the

guards' orders and simply chose not to eat the meal provided by OCJ.

71.     No rule requires people detained at OCJ to eat the jail's food. To the contrary,

ICE's national detention standards, which OCJ is bound by, specifically highlight hunger strikes

as incidents to carefully manage, stating that individuals have a "right to refuse medical

treatment" and that a facility cannot "administer involuntary medical treatment or sustenance

without authorization from ICE/ERO." Despite the fundamental rights at stake in a hunger strike,

OCJ repeatedly failed to implement the required annual hunger-strike training to instruct

employees how to manage a hunger strike.

72.     Starting on the first day of the hunger strike, the participants made their demands

known to multiple guards at OCJ. Though the strike had no leader, Plaintiff Ortiz was called on

to present the unit A1 hunger strikers' demands given his English fluency. Plaintiff Ortiz

informed Sergeant Figueroa and Officers Pascal, Rodriguez, Kania (Badge No. 329), and

Moreno that the strikers were demanding improvements to the inedible food they were being

served. In addition, Plaintiffs Moscoso and Lopez were part of a group in A3 who spoke with

Lieutenant Quizca about their demands that the jail improve the food, their treatment from the guards, and access to medical care.

73.     ICE's national detention standards require OCJ to notify ICE immediately when a hunger strike begins, including but not limited to when a detained person is observed to have not eaten for 72 hours. Upon information and belief, OCJ notified ICE of the plaintiffs' hunger strike on the day it began.

74.     The plaintiffs also made their demands known to ICE officials. On the second day of the strike, the official from ICE charged with overseeing ICE's operations at OCJ as part of the "Jail Liaison Unit"—ICE Supervisory Detention and Deportation Officer Thomas Flynn— came to OCJ and met with Plaintiffs Gonzalez and Ortiz. Upon information and belief, OCJ had Flynn meet with these two hunger strikers because they were believed to be leaders of the strike. Other than telling Plaintiff Ortiz he would "look into" the issues the strikers' raised, Flynn did not engage with their complaints. Instead, Flynn took Plaintiff Gonzalez to speak on the phone with former-Acting Assistant ICE New York Field Office Director, Judith Almodovar. On this call, Plaintiff Gonzalez again detailed the strikers' complaints regarding the conditions of the jail, including the unhealthy, spoiled, substandard food, the racism, and the lack of medical care. Almodovar yelled at Plaintiff Gonzalez, ordering him to calm the strikers down. She asserted that they would change the food and improve conditions. Plaintiff Gonzalez urged Almodovar to come see in person what was going on at OCJ because he was not a leader of the strike and could not end it alone. He told her that "each prisoner is a human being" that deserves to have their voice heard.

75.     From the outset, and throughout the hunger strike, OCJ guards engaged in a campaign of escalating retaliation, including in reaction to media publicity about the hunger

strikers' concerns. The officers began harassing and threatening the hunger strikers, telling them they would be placed in solitary confinement and reported to ICE if they continued to refuse the jail's food. One hunger striker told a reporter, "Everyone is upset and scared. They are threatening to turn off our water."

76.     Defendants Jones and DuBois, whose offices were physically located at the jail, knew that the hunger strike had begun and were coordinating the response to the hunger strikers' advocacy. Resentful of the public reporting about the hunger strike, and the issues underlying it, Defendant Jones disparaged the hunger strikers in an interview with the New York Daily News given during the hunger strike on February 17, saying, "I wouldn't want you to interpret this as some sort of Gandhi thing. They are complaining about the food in jail."

77.     On the second day of the hunger strike, OCJ guards placed all of the hunger strikers in Unit A3, including Plaintiffs Moscoso, Molina, Gonzalez, Lopez, and Palacios, in segregated confinement. The guards locked them in their cells and only let them out for no more than two hours in the morning and another two in the evening to exercise and shower. Detained people who were not participating in the hunger strike were not subjected to segregated confinement and were permitted to leave their cells pursuant to OCJ's normal schedule.

78.     Also on the second day of the hunger strike, OCJ guards conducted a mass search of the cells of people in A3 who were participating in the hunger strike. OCJ officials confiscated commissary food items, which, in some cases, were thrown away, and other personal items, including blankets, towels, clothing, and toothpaste. ICE Officer Flynn was present and observed this mass search of the plaintiffs' cells. During this cell search and throughout the day, OCJ guards threatened the hunger strikers, stating that they would be punished further if they continued the strike.

79.    That same day, and consistent with their express threat of further punishment for their activism, OCJ guards blocked the plaintiffs from using their jail-provided tablets to communicate with people outside of the jail. The guards disabled the tablet's application on which the plaintiffs, and other hunger strikers, were relying to communicate about the hunger strike with their attorneys, community organizers, and families. The guards confiscated the jail-provided tablets of Plaintiffs Gonzalez and Palacios altogether.

80.    OCJ officials, including the Sheriff and Undersheriff, intended for these coordinated actions to prevent the plaintiffs from continuing their advocacy by isolating them from their fellow strikers and the outside world. Because the plaintiffs were confined to their cells for most of the day, without the ability to communicate through the tablets, the plaintiffs were unable to effectively communicate with people outside of the jail, including their attorneys, about what was happening inside OCJ during these critical days. The plaintiffs were frustrated that they could not speak with people outside the jail who could amplify their message and fearful that the jail would continue to punish them.

81.    OCJ officials escalated their retaliation on the following day, which was day three of the publicly reported strike. OCJ guards began issuing disciplinary citations to the participants in the A3 Unit, punishing them with seven days in disciplinary segregation. All plaintiffs except for Plaintiff Ortiz, who was in the A1 Unit, received this citation. The citation states that the participants are accused of violating the following rules: "A1-19 Engaging in/encourage group demonstration/petitions" and "A3-08 Violation of General Rules." A narrative field on the form describes the participants' refusal to accept meal trays and alleges that the "actions are disruptive to the unit and orderly running of the facility." The citation concludes that any similar actions "will result in more severe disciplinary sanctions."

82.     Upon information and belief, ICE was informed of and approved of these disciplinary actions. As noted above, ICE Officer Flynn was present during the hunger strike and for the jail's retaliatory actions, including the cell searches, assignment of segregated confinement, and suppression of the plaintiffs' ability to communicate outside the jail. These actions are part of ICE's routine practice of retaliating against hunger strikers, including in concert with local facilities: a 2021 report revealed that ICE routinely used isolation to separate hunger strikers and even communicated to medical personnel that "the best way to handle these cases is to first, separate the ringleader. Continue to speak to them and try to break their numbers."

83.     On the third day of the strike, additional ICE personnel, including Almodovar, visited the jail to do just this. First, Plaintiff Molina was summoned to meet with Almodovar, who asked him why the hunger strikers were refusing to eat. Plaintiff Molina explained that they were protesting the OCJ guards' racism and the inadequate food and medical care. Almodovar promised to improve conditions at OCJ if they resumed eating, but Plaintiff Molina responded that the strikers would need to see changes first. Almodovar grew angry and suggested that, instead of refusing food altogether, which would be recognized—publicly and embarrassingly— as a hunger strike, they should accept the food and then throw it away.

84.     Later that same day, Almodovar held a second meeting, this time with all of the hunger strike participants in unit A3, including Plaintiffs Molina, Gonzalez, Lopez, Moscoso, and Palacios, in which she further affirmed the connection between the plaintiffs' advocacy and the defendants' retaliatory punishments. Almodovar said that she could not rescind the disciplinary tickets assigning them disciplinary confinement. However, she promised that, if they ended the strike, she would address their demands about the food at the jail, as well as the

abusive and racist guards, and assured those present that the OCJ guards would restore their commissary items and access to their tablets. In light of these assurances, and fearful of further punishment from ICE and OCJ, many of the participants, including all of the plaintiffs, decided to end the strike.

### The Defendants Assign the Plaintiffs Additional Days in Disciplinary Segregation.

85.     The plaintiffs who received a disciplinary citation attended a short hearing within the following few days. Most of the plaintiffs were not provided their citations in Spanish despite their inability to read English. The hearings were conducted by multiple OCJ guards, including one guard who attempted to serve as a Spanish-language interpreter, despite that guard's poor Spanish-language skills. The plaintiffs all pled not guilty to the charges that they had engaged in a group demonstration that was "disruptive to the unit and orderly running of the facility." For example, Plaintiff Moscoso explained during his hearing that he was not guilty of the charges because they had simply sat quietly, alone in their cells during mealtime and did not disrupt anyone. He further explained that the hunger strikers had made a personal choice about their own bodies not to eat and that no rule required them to do so. In later testimony to the New York City Council, Plaintiff Lopez stated that he did not understand why the hunger strikers had been punished and that he declared himself innocent of the disciplinary charges because the protest was peaceful.

86.     Nevertheless, because, in OCJ's eyes, exposing the jail to embarrassment is all it takes to disrupt the "orderly running of the facility," each of the hearings resulted in a finding of "guilty," and the plaintiffs who received citations were assigned seven days in disciplinary segregation. During this time, these plaintiffs were confined to their cells most of the day and were only permitted out of their cells for no more than two hours in the morning and two in the

afternoon. OCJ informed the strikers they were not permitted to speak to each other and split them into groups, staggering the limited time they spent out of their cells.

87.     Within two weeks of the hunger strike, OCJ guards searched the cell of Plaintiff Ortiz and subjected him to two days of segregated confinement in his cell. When asked, the guards refused to explain to him why he was being punished.

88.     The coordinated and uniform response to the publicly reported hunger strike was not the ad hoc action of specific officers but was a concerted effort by OCJ leadership, including Defendant Jones and Defendant DuBois, and ICE to punish the hunger strikers for their speech through segregated confinement.

89.     Senior officials at OCJ, including Defendants Jones and DuBois, were onsite during the hunger strike and were aware of the public attention that the strike and the conditions at the jail were receiving. The press, governmental, and public attention to OCJ that resulted from the hunger strike and the February Civil Rights Complaint was an unusually public moment for OCJ. Moreover, under OCJ's own Disciplinary Segregation policy, no person in immigration detention can generally be placed in segregated confinement without the approval of OCJ's Corrections Administrator or designee. The Corrections Administrator is a member of OCJ's senior leadership team and regularly conferred with Defendants Jones and DuBois. Accordingly, upon information and belief, these officials approved or ratified the use of segregated confinement to punish the hunger strikers.

90.     In an article published by the Times Herald Record on March 22, Defendant Jones "confirmed the jail punished detainees for rejecting food and said it did so because they were acting as a group." Defendant Jones justified the retaliation to the reporter by stating: "You can't

have group resistance to rules in a jail." Defendant Jones did not identify what rule the plaintiffs had been allegedly resisting during the period when they peacefully refused to eat the jail's food.

91.     Defendant Jones and his supervisor Defendant DuBois were closely involved with directing and managing OCJ's response to the hunger strike. On February 24, only a few days after the hunger strike and the February Civil Rights Complaint, Defendant Jones asserted that the complaints by detained persons were "unfounded and malicious" even as he claimed that OCJ was investigating the complaints. Upon information and belief, nothing has come of those "investigations," and no OCJ officials have been disciplined for their response to the hunger strike.

92.     ICE also sanctioned the plaintiffs' disciplinary segregation. ICE officials were present when the plaintiffs received their citations and, instead of preventing this retaliatory action as required by the national detention standards, the officials collaborated with the jail to silence the plaintiffs. ICE routinely employs segregated confinement to end hunger strikes. In 2019 alone, the International Consortium of Investigative Journalists identified 182 cases in which ICE placed hunger strikers in solitary confinement.

93.     Following the hunger strike, a journalist visited OCJ and requested to speak to Plaintiff Gonzalez, among other detained people. Defendant Jones accompanied the journalist throughout his visit and was present for all of the conversations that the journalist had at the jail. Plaintiff Gonzalez and Plaintiff Ortiz spoke with this journalist. Plaintiff Moscoso, by contrast, was locked in his cell for the entirety of the journalist's visit and was not able to interact with him. Another detained person recounted that his messaging application was blocked during the journalist's visit.

**Plaintiffs Lopez and Moscoso Participate in a New York City Council Hearing.**

94.      Soon after the hunger strike, several people detained at OCJ, including Plaintiffs Lopez and Moscoso, provided public written testimonies that were read on their behalf at a six-hour New York City Council hearing on conditions at OCJ that took place on February 28, 2022. Testimony about Plaintiff Gonzalez's experience was also provided at the hearing. As noted above, OCJ officials were invited to the hearing, and, although they did not attend, the hearing testimony was made publicly available online. Out of fear of retaliation, the plaintiffs were identified solely by their initials in the testimony. However, upon information and belief, the defendants were aware of the testimony and knew the plaintiffs' identity because of the content of their testimony about conditions and mistreatment and the use of their actual initials.

95.      Plaintiffs Lopez and Moscoso testified to OCJ's failure to provide adequate medical care and mental-health services. Specifically, Plaintiff Lopez testified to how the conditions in OCJ exacerbated his Post-Traumatic Stress Disorder, which resulted from his experience with forced labor and trafficking. Plaintiff Moscoso similarly shared how the conditions at OCJ have worsened his physical and mental health and described OCJ's denial of medical care and failure to take precautionary measures to prevent the spread of COVID-19.

96.      Plaintiffs Lopez and Moscoso also testified to the poor quality of the food, describing it as smelling "incredibly bad," "almost raw," and "inedible." Plaintiffs Lopez and Moscoso recounted the OCJ guards' racism and other forms of mistreatment. Finally, Plaintiffs Lopez and Moscoso testified about OCJ's retaliation against them for peacefully protesting these conditions, including by locking them in their cells and confiscating their belongings. Plaintiff Lopez further described how he and others detained at OCJ have stopped reporting complaints because of this retaliation.

97.     Ultimately, ICE's promised improvements to the food at OCJ never materialized. When Plaintiff Molina followed up with an ICE supervisor several days after the hunger strike ended, he was told that certain requested improvements were "too expensive." Moreover, the other conditions issues, including inadequate medical care, persisted at the jail.

98.     Several months after the hunger strike, in May 2022, two New York City councilmembers visited OCJ. They were escorted throughout the facility by Defendant Jones, who again disparaged the complaints as untrue. The councilmembers voiced concerns about a lack of COVID-19 protocols, the "egregious" and inadequate medical care, and insufficient language services.

**The Plaintiffs Submit Additional Public Complaints to DHS.**

99.     Fearful of further retaliation but resolved to continue their advocacy, on April 20, 2022, several hunger strikers, including Plaintiff Gonzalez and Ortiz, participated in a second, supplemental complaint submitted by civil rights groups to the DHS Office for Civil Rights and Civil Liberties. This complaint details the ways in which OCJ guards retaliated against people in detention for advocating for their rights and for ICE's own standards to be met, including the particularly intense retaliation in response to the February hunger strike. The complaint describes the assignment of segregated confinement to the hunger strikers and notes that, following the strike, OCJ withheld food and reduced the portion size of food on the meal trays; the jail also shortened the mealtime so people did not have enough time to eat their food.

100.    About one week after participating in this group complaint, on April 28, 2022, Plaintiff Gonzalez filed a second individual complaint with DHS's Office for Civil Rights and Civil Liberties about the abuse he continued to suffer at the hands of the OCJ staff.

101.    By the time DHS officials investigating the multiple complaints finally visited OCJ in the fall of 2022, Plaintiff Gonzalez had been released. The investigators asked to speak

with small groups, including Plaintiffs Ortiz and Moscoso. The DHS officials informed them that the agency had received their Civil Rights Complaints and a letter that a group of detained people, including Plaintiffs Ortiz and Moscoso, had sent to DHS about the continuing conditions issues at OCJ. Plaintiffs Ortiz and Moscoso answered the DHS officers' questions about the conditions at the jail.

102.    For the two-week period immediately following this meeting, people who met with the DHS representatives, including Plaintiff Ortiz, had their cells searched. Multiple officers even brought a dog to search the cell of one of the meeting participants.

### The Defendants Transfer the Plaintiffs to Punitive Segregation Units at OCJ and to Detention Facilities Far from New York.

103.    In the spring and summer of 2022, after months of continued advocacy by the plaintiffs, the defendants engaged in a series of retaliatory, coordinated transfers.

*The Defendants Transfer Plaintiff Gonzalez to Punitive Segregation.*

104.    In approximately May 2022, shortly after Plaintiff Gonzalez submitted his supplemental individual complaint to DHS and provided information for the complaint by civil rights groups, OCJ transferred Plaintiff Gonzalez to a criminal detention unit within OCJ. No explanation was provided for why Plaintiff Gonzalez was transferred from A3, where he had been housed with other people in ICE custody, to a location in criminal segregation. Upon information and belief, this transfer was done as retaliation against Plaintiff Gonzalez for his advocacy, complaints, and participation in the hunger strike. Plaintiff Gonzalez remained in this unit until he secured his release through a habeas petition in August 2022.

*The Defendants Transfer Plaintiffs Lopez, Moscoso, and Ortiz to a Punitive Segregation Unit.*

105.    On July 26, 2022, OCJ and ICE coordinated a mass transfer of the plaintiffs and others who had participated in advocacy about conditions at the jail. One group, including

Plaintiffs Lopez, Moscoso, and Ortiz, was transferred to a disciplinary segregation unit at OCJ, while a second group, including Plaintiffs Molina and Palacios, was transferred to detention centers in the South. Upon information and belief, Defendants Jones and DuBois approved the transfer to the previously unused disciplinary segregation unit, coordinating this large intra-facility transfer to coincide with the transfer of the other group out of OCJ.

106.     Everyone who participated in the hunger strike and remained detained at OCJ was transferred to OCJ's disciplinary segregation unit: Delta 1 ("D1"). Guards woke the plaintiffs in the early morning hours and moved them to the new unit with no prior notice to them or their attorneys. The unit had previously been closed, and OCJ did not clean or prepare the unit before moving in the new group. The plaintiffs observed the walls and floors were filthy and covered in urine, snot, saliva, and other unknown stains. Plaintiff Ortiz asked for supplies so the detained people could clean their cells themselves, but the guards refused. There was no potable water in the unit for over 24 hours.

107.     OCJ's "Statement of Confinement" form for assigning segregated confinement notes the D1 unit is for "disciplinary segregation" and requires medical clearance before someone is placed in those restrictive conditions. Upon information and belief, no medical clearance was issued for any of the plaintiffs prior to their placement in this disciplinary segregation unit. None of the plaintiffs received any disciplinary notice or process prior to their placement in D1.

108.     People incarcerated in this punitive segregation unit are detained behind solid metal, rather than windowed wooden, doors and have limited access to an outdoor space far smaller than the one available to them before their transfer. Among other issues, the plaintiffs have described freezing cold temperatures, no access to laundry for weeks on end, limited to no

equipment to exercise, and a single small television. The bathrooms are also different from the other units, providing less privacy and no closed doors.

109.    Unlike the other units, the people in the punitive segregation unit were not permitted to make free calls to their families for months. When the plaintiffs complained, OCJ guards told them that the unit was not set up for the general population as it is a disciplinary unit and that there was nothing they could do.

110.    It was also impossible for people in the punitive segregation unit to have confidential conversations with their attorneys for several months after their transfer. Phone calls were subject to monitoring. And it took several months for the plaintiffs and their attorneys to successfully use a videoconferencing application on the jail-provided tablets to confidentially communicate. Even then, the system—which costs both the attorney and the detained person money to operate—often malfunctioned, and the jail did not provide confidential spaces for its use. It was not until February 2023—seven months after the jail transferred the plaintiffs—that OCJ gave people detained in the disciplinary segregation unit access to the web-based videoconferencing system available in the rest of the jail. While this web-based system is itself flawed due to severe limitations on scheduling and frequent technical malfunctioning, the months-long loss of its use created a crisis for people detained in the unit attempting to access their attorneys.

111.    Shortly after the group was moved to the punitive segregation unit, ICE Supervisor Flynn visited the D1 unit and said that he did not know why the group had been moved to disciplinary segregation but that he would try to solve the situation. But, in the many months people have been detained there, neither Flynn nor any other ICE official has intervened to rectify OCJ's retaliatory transfer of the plaintiffs to this unit.

112.    Under the national detention standards, OCJ is required to notify ICE of any segregation placement of a detained person lasting 14 or more days. OCJ is required to coordinate with ICE to consider whether a less restrictive housing or custodial option is appropriate and available.

113.    The detention standards further require that individuals in detention may not be denied legal visits and must be provided with telephone access so that they can contact their legal representatives. Facilities that contract with ICE are required to ensure that detained people's legal phone calls are private and cannot be overheard by officers, staff, or other detained people.

114.    After their transfer to the disciplinary segregation unit, the plaintiffs continued to object to the conditions of their confinement, the continued medical neglect and rancid food that they are served, and their continued interactions with abusive officers. The plaintiffs have written letters to journalists and politicians about the conditions of their confinement in the punitive segregation unit.

115.    Upon information and belief, everyone who participated in the hunger strike and remains detained at OCJ is currently detained in the punitive segregation unit. Defendant Arteta, who succeeded Defendant DuBois as Sheriff on January 1, 2023, has continued detaining the plaintiffs in the punitive segregation unit despite repeated requests to transfer them back to the general population units.

116.    Plaintiff Ortiz was recently released from detention, but Plaintiffs Moscoso and Lopez remain in the disciplinary unit to this day and are fearful of further retaliation based on the brutal responses to their prior advocacy. While they are suffering in their conditions of confinement, they fear being transferred far from their families and are concerned that a transfer out of the state would impact their ability to access their attorneys and immigration cases. Upon

information and belief, OCJ guards continue to threaten individuals with transfers for speaking about conditions at OCJ.

**Defendants Transfer Plaintiffs Molina and Palacios to Detention Centers in the South, Where They Remain Detained Today.**

117.    On the same day that the plaintiffs at OCJ were transferred to the punitive segregation unit, the defendants collaborated to transfer a large group of people incarcerated at OCJ to detention centers outside of New York. Shortly after the hunger strike, Undersheriff Jones warned that complaints like the February Civil Rights Complaint "could result in [people detained at OCJ] getting transferred to jails farther from their families." He threatened, "In their minds, they want them released into the world, which is not going to happen, ever . . . [t]hey're just going to move them to a different facility."[5]

118.    The defendants followed through on this threat on July 26, 2022, and transferred a large group of the people in ICE detention at OCJ without advance notice to them or to their attorneys regarding when and where they were going to be transferred. Many people in this group, including Plaintiffs Molina and Palacios, had participated in the hunger strike.

119.    After waking the group of transferees before dawn, OCJ guards threw away all of their personal items, including food, clothes, and jewelry. The guards manhandled and cursed at individuals in the group as they were leaving OCJ. The transferees were chained at their hands and feet and remained shackled for over 24 hours. One group, including Plaintiffs Molina and Palacios, was loaded into vans with no air conditioning at dawn and brought to a DHS office in New Jersey. At the DHS office in New Jersey, Plaintiff Molina's nose started bleeding from the

---

[5] Defendant Jones is incorrect on this point. As explained below, because both Plaintiff Molina and Plaintiff Palacios are subject to discretionary detention, ICE has the authority to release them from detention at any point in time. Even people subject to ICE's mandatory detention provision routinely secure their release from OCJ.

heat. He was given no medical care for his nosebleed, and because he was shackled, he was unable to stop the bleeding himself and bled all over his clothing. The transferees could not walk and were only given the opportunity to use a restroom once that day. After the transfer, their hands and feet were swollen from the shackles.

120.    ICE transferred most of this group, including Plaintiffs Molina and Palacios, to Adams in Natchez, Mississippi, which is also the subject of recent civil rights complaints, including for physical abuse by officers and inadequate COVID-19 protocols.

121.    On March 16, 2023, ICE once again transferred Plaintiffs Molina and Palacios to facilities in Louisiana (Pine Prairie and Winn, respectively). Everyone who was transferred with Plaintiffs Molina and Palacios from Adams to Louisiana had also been detained at OCJ. Again, ICE did not give Plaintiffs Molina's and Palacios's immigration counsel advance notice of the transfers. And ICE gave neither these plaintiffs nor their counsel any explanation for their transfer.

122.    Many of the individuals who were transferred from OCJ, including Plaintiffs Molina and Palacios, are represented by New York City-based legal service providers and public-defender offices. In response to rumors of the impending transfers from OCJ, some legal service providers asked ICE whether their clients would be transferred out of state; ICE denied specific transfer plans and gave no indication that a transfer as far as Mississippi was being contemplated.

123.    The plaintiffs have had difficulty speaking with their counsel while detained outside of New York. It took Plaintiff Molina two weeks after being transferred to Adams to even reach his attorney. Moreover, Plaintiff Molina's and Plaintiff Palacios's attorneys are no longer able to visit them in person. Plaintiff Molina and Palacios's attorneys are based in New

York.[6] Neither of these plaintiffs' attorneys have the capacity or resources to travel to rural Mississippi and Louisiana.

124.    Unlike at OCJ, Adams does not provide confidential video-teleconferencing, so Plaintiffs Molina and Palacios's attorneys had no way to communicate with them confidentially while at Adams in a manner that would allow them to see their clients' facial expressions, demeanor, and body language. Adams does allow for confidential legal telephone calls but does not permit the detained person to schedule those calls; an attorney must request them. Similarly, while Pine Prairie and Winn do provide confidential video-teleconferencing, an attorney must request them. And the only way for Plaintiff Molina and Plaintiff Palacios to exchange documents with their attorneys since their transfer has been through legal mail, but this method has not always been confidential because staff at Adams sometimes opened Plaintiff Molina's legal mail outside of his presence.

125.    ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals from one Field Office's area of responsibility to another if, *inter alia*, they have immediate family, an attorney of record, pending or ongoing removal proceedings within the area, or if they have been granted bond or scheduled for a bond hearing, unless a Field Office Director or their designee deems the transfer necessary for one of the seven specific reasons identified in the policy.

126.    The policy notes that "immediate family" "may include: mothers, fathers, step-parents, foster parents, brothers, sisters, stepbrothers, stepsisters, biological and adopted children, stepchildren, foster children, and spouses, including common-law marriage or civil unions and cohabitating domestic partnerships legally recognized by a state or other governmental entity...."

---

[6] Plaintiff Palacios's attorney also has an office in Michigan.

127.    The policy states that "[t]he Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File."

128.    The policy also states that ICE is required to notify the attorney of record that the individual "is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs."

129.    At the times he was transferred to Adams and Pine Prairie, Plaintiff Molina had an attorney of record and several immediate family members, including a five-year-old daughter, four siblings, a stepmother, great aunt, aunts, uncles, and cousins, in the New York area. He also had ongoing removal proceedings in New York.

130.    At the times he was transferred to Adams and Winn, Plaintiff Palacios had an attorney of record and several immediate family members, including an eight-year-old son, two younger siblings, and parents in the New York area. He also had ongoing removal proceedings in New York.

131.    Upon information and belief, there was no justification provided by ICE for the transfers to Adams and Louisiana, and the transfers were not necessary. As an initial matter, at all relevant times, ICE had the discretion to release on bond or parole Plaintiff Molina and Plaintiff Palacios. Additionally, the defendants continued detaining additional people at OCJ after July 26, 2022. While in July 2022, there were 50 people in ICE detention at OCJ, that number steadily grew to 80 by November 2022.

132.     Additionally, ICE Directive 11064.3, "Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults" requires the Field Office Director to refrain from transferring detained noncitizens outside of the Field Office's area of responsibility where their child or children are located unless dictated by exceptional circumstances or court order. Even when transfer is dictated, the Field Office Director must place the noncitizen as close as practicable to the minor child or children.

133.     Both Plaintiff Molina and Plaintiff Palacios have minor children in the New York area, in addition to other family members.

134.     While both plaintiffs wish to be close to their family and attorneys, and plan to return to New York if released, they fear returning to OCJ because of the abhorrent conditions and retaliation they endured in the jail.

135.     Defendants Jones and DuBois coordinated and approved of this major shift to the immigration detention population in OCJ. Defendant Jones informed media outlets that OCJ requested that ICE transfer this large group. Defendant Jones effectively admitted that the plaintiffs were basically asking for it; i.e. that they were transferred because of the spotlight their advocacy support groups placed on the OCJ, stating that they were "paid to make allegations" and that "we had said to those groups and elected officials who came here from New York City []'If you got your wish and detainees were removed from Orange County they would go to a place where people would be unable to visit them like they are today,' . . . You hate to be right. But isn't that exactly what happened?" Upon information and belief, a major operational decision such as the July 25 transfer must be approved by the Sheriff and/or Undersheriff of Orange County.

136.    Under the terms of its contract with OCJ, ICE must provide express authorization for the transfer of any detained persons. ICE, in partnership with its contracted facilities, has long used its vast web of detention centers to transfer people in retaliation for engaging in protected speech or conduct, including hunger strikes. A recent report analyzing over 10,000 pages of documents revealed ICE and its contractors' routine use of punitive measures and coercive tactics including, *inter alia*, retaliatory transfers, to end hunger strikes and quash other types of protected speech.

## JURISDICTION AND VENUE

137.    This action is brought under the U.S. Constitution, 42 U.S.C. § 1983, and the Administrative Procedure Act ("APA"). The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3). Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

138.    An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201. The Court has authority to issue declaratory and injunctive relief consistent with the APA, 5 U.S.C. § 706, and under 28 U.S.C. §§ 2201 and 2202.

139.    Venue lies in the Southern District of New York under 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## CLAIMS FOR RELIEF

### First Claim
### 42 U.S.C. § 1983: Violation of the First Amendment to the U.S. Constitution
### (all Plaintiffs against Defendant Orange County, New York and Defendants Jones, DuBois, and Arteta)

140.    The conduct of Defendants Orange County, New York, Jones, DuBois, and Arteta, as alleged in the Complaint, violates the First Amendment to the U.S. Constitution.

**Second Claim**
**Violation of the First Amendment to the U.S. Constitution**
**(all Plaintiffs against Defendants DHS, ICE, and Genalo)**

141.     The conduct of Defendants DHS, ICE, and Genalo, as alleged in the Complaint,

violates the First Amendment to the U.S. Constitution.

**Third Claim**
**5 U.S.C. § 702: Violation of the Administrative Procedure Act**
**(Plaintiffs Molina and Palacios against Defendants DHS and ICE)**

142.     ICE policies provide certain requirements related to the transfer of detained

immigrants outside of a field office's area of responsibility. If an agency fails to follow its own

policies, "the APA (as developed by case law) gives aggrieved parties a cause of action to

enforce compliance." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130

(2d Cir. 2020); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

143.     Defendants DHS and ICE's transfers of Plaintiffs Molina and Palacios violates

the APA because the transfers did not comply with Defendants DHS and ICE's own policies

regarding such transfers.

**REQUEST FOR RELIEF**

WHEREFORE, the plaintiffs hereby requests that the Court:

    a.  Declare that the defendants' conduct, as alleged in the Complaint, violates the
    plaintiffs' rights under the First Amendment;

    b.  Declare that the conduct of Defendants DHS and ICE, as alleged in the Complaint,
    violated their own agency policies and thus violates the Administrative Procedure
    Act;

    c.  Enjoin the defendants from subjecting Plaintiffs Moscoso and Lopez to the
    unlawful acts and omissions described herein, and to refrain from engaging in

further retaliation, including but not limited to retaliatory transfers to facilities outside of New York State;

d.   Enjoin the defendants to transfer Plaintiffs Moscoso and Lopez from the D1 unit to a general population unit within OCJ;

e.   Set aside Plaintiffs Molina and Palacios's transfers as violative of ICE Policy No. 11022.1 and/or ICE Directive 11064.3;

f.   Enjoin Defendants DHS and ICE to transfer Plaintiffs Molina and Palacios back to the New York City area, where their counsel and family are located, but not to OCJ where they fear further retaliation and abusive conditions;

g.   Award the plaintiffs compensatory damages, together with interest and costs, against Orange County and Individual County Defendants jointly and severally;

h.   Award the plaintiffs reasonable attorney's fees and costs; and

i.   Grant such other and further relief as the Court deems just and equitable.

Dated: April 4, 2023
New York, New York

Respectfully submitted,

*/s/ Amy Belsher*

AMY BELSHER
ANTONY GEMMELL
GUADALUPE VICTORIA AGUIRRE
CHRISTOPHER DUNN
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: 212-607-3300
abelsher@nyclu.org
agemmell@nyclu.org
laguirre@nyclu.org
cdunn@nyclu.org

SAMAH SISAY
ASTHA SHARMA POKHAREL
BAHER AZMY
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, N.Y. 10007
Tel: 212-614-6484
ssisay@ccrjustice.org
asharmapokharel@ccrjustice.org
bazmy@ccrjustice.org

CAITLIN J. SANDLEY*
Center for Constitutional Rights
P.O. Box 486
Birmingham, A.L. 35201
Tel: 212-614-6443
csandley@ccrjustice.org

NIJI JAIN
KSHITHIJ SHRINATH
The Bronx Defenders
360 E. 161st Street
Bronx, N.Y. 10451
Tel: 718-838-7878
nijij@bronxdefenders.org
kshrinath@bronxdefenders.org

*Attorneys for Plaintiffs*

*\*Pro hac vice* petition forthcoming