UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NAHUM GILBERTO ORTIZ, DENNY          :
MOLINA CANTOR, LUCAS PALACIOS        :
ALVARADO, JEREMIAS LOPEZ LOPEZ,      :
ELMER MOSCOSO GUERRA, and LUIS       :
GONZALEZ CARBAJAL,                   :
                Plaintiffs,            :
                                    :
v.                                   :
                                    :
ORANGE COUNTY, NEW YORK; PAUL        :
ARTETA, Sheriff of Orange County, in his   :     **OPINION AND ORDER**
official and individual capacities; CARL   :
DUBOIS, former Sheriff of Orange County, in   :     23 CV 2802 (VB)
his individual capacity; KENNETH JONES,   :
former Undersheriff of Orange County, in his   :
individual capacity; U.S. DEPARTMENT OF   :
HOMELAND SECURITY; U.S.              :
IMMIGRATION AND CUSTOMS              :
ENFORCEMENT; and KENNETH GENALO,     :
Acting ICE Field Office Director, in his official   :
capacity,                            :
                Defendants.            :
------------------------------------------------------------x

Briccetti, J.:

       Plaintiffs Nahum Gilberto Ortiz, Denny Molina Cantor, Lucas Palacios Alvarado,

Jeremias Lopez Lopez, Elmer Moscoso Guerra, and Luis Gonzalez Carbajal, all individuals who

were or are civil immigration detainees at the Orange County Jail ("OCJ") in Goshen, New

York, bring this action against Orange County, New York; Paul Arteta, Sheriff of Orange

County; Carl Dubois, former Sheriff of Orange County; and Kenneth Jones, former Undersheriff

of Orange County (together, the "Orange County Defendants"); as well as against the U.S.

Department of Homeland Security ("DHS"); U.S. Immigration and Customs Enforcement

("ICE"); and Kenneth Genalo, Acting ICE Field Office Director (together with DHS and ICE,

the "Federal Defendants").  Plaintiffs bring a First Amendment claim against the Orange County

Defendants under 42 U.S.C. § 1983, and they bring claims against the Federal Defendants for violations of the First Amendment and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.  Plaintiffs principally claim defendants retaliated against them for complaining about allegedly poor conditions at OCJ.

Now pending is the Federal Defendants' motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6).  (Doc. #38).[1]

For the reasons set forth below, the motion is DENIED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3).

## BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in plaintiffs' favor, as summarized below.  For the sake of brevity, the Court summarizes only those facts relevant to the instant motion.

Orange County contracts with ICE to house civil detainees at OCJ while they await the outcome of their immigration proceedings.  (Doc. #7 ("Compl.") ¶ 2).  At the time the complaint was filed, plaintiffs allege approximately 320 people were incarcerated at OCJ, approximately 80 of whom were held pursuant to the ICE contract.[2]

Plaintiffs are six individuals who were or are detained at OCJ under the ICE contract.[3] Plaintiffs allege that while at OCJ, they faced "abuse, racist mistreatment and neglect by jail

---

[1]    The Orange County Defendants answered the complaint.  (See Doc. #40).

[2]    The estimate of individuals held pursuant to the ICE contract is based on the "average daily population of those held in federal immigration custody at OCJ since September 2022." (Compl. ¶ 28).

[3]    According to the complaint, only Lopez and Moscoso remain confined in OCJ.  (Compl ¶¶ 15, 16).  Ortiz was released from detention at OCJ on March 8, 2023.  (Id. ¶ 12).  Gonzalez

officials," including "[a]ssaults and verbal racist abuse," the denial of basic medical and mental health care, and inedible, rotten meals.  (Id. ¶¶ 3, 4).

According to plaintiffs, the "[c]onditions at OCJ are under the direct control of the Orange County Sheriff."  (Compl. ¶ 29).  However, ICE is allegedly responsible for ensuring OCJ complies with ICE's minimum detention standards for contracting facilities.[4]  For example, the ICE detention standards require contracting facilities to "coordinate with ICE" to consider "less restrictive housing or custodial option[s]" for detainees placed in segregation for fourteen or more days (id. ¶ 112), forbid disciplinary retaliation against detainees for lodging complaints (id. ¶ 31), and provide that detainees "may not be denied legal visits." (Id. ¶ 113).

In 2021, plaintiffs and other immigration detainees at OCJ began filing grievances and administrative complaints and contacting elected officials, reporters, and advocates about the conditions at OCJ.  Gonzalez alleges that in approximately September 2021, he submitted formal written grievances through OCJ's lockbox system[5] about "racism, threats of violence, and verbal

---

was released from detention at OCJ on August 8, 2022.  (Id. ¶ 17).  Molina and Palacios were detained at OCJ until July 2022 when they were transferred to detention facilities in Mississippi, and then to Louisiana, where they remained detained at the time of the complaint.  (Id. ¶¶ 13, 14).

[4]     See U.S. Immigr. & Customs Enf't, National Detention Standards for Non-Dedicated Facilities (2019), https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.  On a motion to dismiss, the Court generally may consider only documents attached to, incorporated by reference in, or integral to the complaint.  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  However, the Court may take judicial notice of documents that are publicly accessible on an official government website.  See Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford, 544 F. Supp. 3d 405, 412 (S.D.N.Y. 2021).  The parties agree the Court may properly consider ICE's detention standards (see Doc. #49 at 16 n.11), so the Court takes judicial notice of them for the purpose of ruling on the motion.

[5]     Plaintiffs assert "[e]ach housing unit at OCJ has a lockbox where complaints could be made directly to ICE."  (Compl. ¶ 52).

abuse" by two specific correction officers.  (Compl. ¶ 49).  He alleges OCJ informed the

correction officers of Gonzalez's complaints but took no meaningful corrective action.

Plaintiffs further allege OCJ officials told them to "complain about their mistreatment to

ICE," but plaintiffs were unable to do so because ICE officials did not regularly visit OCJ and,

when they did visit, they did so only at times when plaintiffs were locked in their cells.  (Compl.

¶ 51).  Plaintiffs also allege they "frequently made use of" the lockbox system to lodge

complaints directly with ICE about the food, racist guards, and other conditions of confinement.

(Id. ¶ 52).  However, according to plaintiffs, ICE failed to respond to the complaints in the

lockbox "for months at a time."  (Id.).

In November 2021, Gonzalez alleges he submitted a complaint to DHS's Office for Civil

Rights and Civil Liberties "detailing retaliation, abuse, racism, hostile disregard of his medical

and mental-health needs, violations of his rights, and retaliatory use of solitary confinement

through medical isolation."  (Compl. ¶ 55).  DHS investigators allegedly visited OCJ to speak to

Gonzalez about his complaint.  However, according to plaintiffs, following this visit, OCJ guards

became more physically aggressive towards Gonzalez, commented on Gonzalez's

communications with DHS, and threatened to have him deported.

In early to mid-February 2022, Ortiz, Molina, and Gonzalez allege they participated in a

group complaint submitted to DHS's Office for Civil Rights and Civil Liberties about several

issues at OCJ, including retaliatory violence and disciplinary segregation against detained people

who registered informal and formal complaints.  The complaint relies, in part, on Ortiz and

Molina's sworn statements.

On February 16, 2022, plaintiffs and dozens of others detained at OCJ commenced a

multiday hunger strike to "convince ICE and OCJ to remove the racist and abusive guards, to

improve access to medical and mental health treatment, and to provide [the detainees] with edible and nutritious food."  (Compl. ¶ 69).  Plaintiffs allege OCJ notified ICE of the hunger strike that day.

On February 17, 2022, the second day of the strike, Gonzalez and Ortiz allege they met with ICE Supervisory Detention and Deportation Officer Thomas Flynn ("ICE Officer Flynn"). ICE Officer Flynn allegedly told these plaintiffs he would "look into" the strikers' complaints, and he connected Gonzalez with former Acting Assistant ICE New York Field Office Director Judith Almodovar by phone.  (Compl. ¶ 74).  During the call, plaintiffs allege Almodovar "yelled at Plaintiff Gonzalez, ordering him to calm the strikers down" and "asserted that they would change the food and improve conditions."  (Id.).

The same day, according to plaintiffs, OCJ guards placed all the hunger strikers from OCJ's Unit A3, including Moscoso, Molina, Gonzalez, Lopez, and Palacios, in segregated confinement.[6]  These plaintiffs were allegedly locked in their cells except for two hours in the morning and two hours in the evening to exercise and shower.  OCJ guards also purportedly conducted "a mass search of the cells of people in A3 who were participating in the hunger strike," and confiscated or discarded commissary food and personal items.  (Compl. ¶ 78). Plaintiffs allege "ICE Officer Flynn was present and observed this mass search."  (Id.).  During the search, plaintiffs allege OCJ guards threatened that the hunger strikers would be punished further for continuing the strike.  The same day, OCJ guards allegedly blocked plaintiffs from using their jail-provided tablet computers to communicate with persons outside the jail.

---

[6]     At the time of the hunger strike, all of the plaintiffs except Ortiz were housed in OCJ's Unit A3, while Ortiz was housed in Unit A1.  Plaintiffs allege "[t]he hunger strike involved a significant portion of the A3 unit in OCJ," as well as "several people in the A1 unit, including Plaintiff Ortiz."  (Compl. ¶ 69).

On February 18, 2022, the third day of the hunger strike, plaintiffs allege OCJ guards issued disciplinary citations to Moscoso, Molina, Gonzalez, Lopez, and Palacios for engaging in "group demonstration/petitions" and violating the "General Rules." (Compl. ¶ 81). According to plaintiffs, they were punished with seven days' disciplinary segregation. Plaintiffs also allege "ICE officials were present when the plaintiffs received their citations." (Id. ¶ 92).

Also on February 18, 2022, Molina met with ICE Director Almodovar, who allegedly assured him the strikers' demands would be addressed if they ended the strike. Later that day, according to plaintiffs, ICE Director Almodovar held a meeting with all the hunger strikers from Unit A3, including Molina, Gonzalez, Lopez, Moscoso, and Palacios, during which she said she could not rescind the disciplinary tickets they received earlier that day, but she would address their other demands and restore their commissary items and access to their tablets if they ended the strike. Based on these assurances, plaintiffs allege they decided to end the strike.

A few days later, Moscoso, Molina, Gonzalez, Lopez, and Palacios allege they were found guilty of the violations charged in the disciplinary citations and assigned seven days in disciplinary segregation.[7] Moreover, within two weeks of the hunger strike, OCJ guards allegedly searched Ortiz's cell and subjected him to two days of segregated confinement without explanation.

On February 28, 2022, the written testimony of Lopez, Moscoso, and Gonzalez was allegedly read at a New York City Council hearing regarding the conditions at OCJ. Although these plaintiffs were identified solely by their initials, they allege defendants could determine their identities because of the content of their testimonies.

---

[7]     It is not clear from the complaint whether this seven day punishment ran concurrently with the seven day sentence imposed on February 18, 2022, or whether an additional seven day disciplinary segregation period was imposed.

Plaintiffs allege ICE's assurances that the food would improve at OCJ never materialized, and that Molina was told by an ICE supervisor the requested improvements were "too expensive." (Compl. ¶ 97). Plaintiffs contend the other issues they protested through the hunger strike, such as inadequate medical care, remained unaddressed.

On March 22, 2022, Jones, one of the Orange County Defendants, gave a statement to the Times Herald Record, in which he allegedly "confirmed the jail punished detainees for rejecting food and said it did so because they were acting as a group." (Compl. ¶ 90).

On April 20, 2022, Gonzalez and Ortiz participated in a second supplemental complaint submitted to the DHS Office for Civil Rights and Civil Liberties about retaliation by the OCJ guards against persons participating in the hunger strike. The complaint alleged, among other things, that, following the strike, OCJ withheld food, reduced portion sizes, and shortened mealtimes so that detainees did not have enough time to eat.

On April 28, 2022, Gonzalez filed a second individual complaint with the DHS Office for Civil Rights and Civil Liberties.

In May 2022, Gonzalez was allegedly transferred to a criminal detention unit within OCJ without explanation, where he remained until he was released through a habeas petition in August 2022.

On July 26, 2022, Lopez, Moscoso, and Ortiz, along with all others who participated in the hunger strike and remained at OCJ, were transferred to a disciplinary segregation unit within OCJ that was previously not in use—referred to as "D1 Unit." (Compl. ¶ 106). Plaintiffs allege D1 Unit was filthy and that Ortiz's request for cleaning supplies was denied. Plaintiffs also allege they were not provided potable water for over twenty-four hours, endured freezing cold temperatures, were deprived of access to laundry for weeks, were provided limited to no exercise

equipment, and were afforded less privacy than in other units.  Plaintiffs also allege they were

not permitted to make phone calls to their families or have confidential conversations with their

attorneys while housed in D1 Unit.

Shortly after Lopez, Moscoso, and Ortiz were moved to D1 Unit, they allege ICE Officer

Flynn visited and said he "did not know why the group had been moved to disciplinary

segregation but that he would try to solve the situation."  (Compl. ¶ 111).  However, according to

plaintiffs, they continued to be detained in D1 Unit.[8]

Also on July 26, 2022, ICE transferred Molina and Palacios, as well as other hunger

strike participants, to detention centers in Natchez, Mississippi.  That morning, Molina and

Palacios allege OCJ guards threw away their personal belongings, chained and shackled them,

and loaded them into vans with no air conditioning.  Molina and Palacios were allegedly taken

first to a DHS office in New Jersey, where they remained chained and shackled all day and were

only permitted to use the restroom once.  Molina and Palacios contend that neither of their

lawyers were notified of their transfers.  Plaintiffs claim these transfers were executed in

retaliation for plaintiffs' exercising their First Amendment rights to protest and complain about

the substandard conditions at OCJ.

In the fall of 2022, DHS officials allegedly visited the jail and spoke to Ortiz and

Moscoso about the April complaints.[9]  Ortiz and others who met with the DHS officials

allegedly had their cells searched during the two-week period following this visit.

On March 16, 2023, ICE transferred Molina and Palacios from Mississippi to detention

centers in Louisiana.  Molina and Palacios allege their lawyers were likewise not notified of their

---

[8]     As of the time the complaint was filed, Ortiz had allegedly been released from detention,
but Moscoso and Lopez remained in D1 Unit.

[9]     By this time, plaintiffs allege Gonzalez had been released.

transfers and that they have had difficulty communicating with their lawyers, who are based in New York.

Plaintiffs allege the transfers of Molina and Palacios violated ICE policies.  For example, plaintiffs claim ICE Policy 11022.1 provides that, unless a field office director deems a transfer necessary for one of seven enumerated reasons, a detainee with immediate family, an attorney of record, or pending or ongoing removal proceedings in that area, or who has been granted bond or has a scheduled bond hearing in that area, may not be transferred outside the field office's area of responsibility.  If such a transfer does occur, the policy allegedly requires that attorneys for the detainee be notified within twenty-four hours.  Likewise, ICE Directive 11064.3 allegedly requires the field office director to refrain from transferring detained noncitizens outside of the field office's area of responsibility where the noncitizen's children are located unless necessitated by exceptional circumstances or court order.[10]  Both Molina and Palacios allege they had immediate family members (including minor children), an attorney of record, and ongoing removal proceedings in the New York area at the time of each transfer.  They allege ICE provided no justification for these transfers, as required by its own regulations.

Plaintiffs also allege the contract between ICE and OCJ requires ICE to provide express authorization for the transfer of any person detained pursuant to its contract with OCJ.[11]

## DISCUSSION

I.   Standard of Review

A.   Rule 12(b)(1)

A district court must dismiss an action pursuant to Rule 12(b)(1) "for lack of subject

---

[10]    Plaintiffs do not attach ICE Policy 11022.1 or ICE Directive 11064.3 to the complaint.

[11]    Plaintiffs do not attach the contract between ICE and OCJ to the complaint.

matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it." <u>Conn.</u>
<u>Parents Union v. Russell-Tucker</u>, 8 F.4th 167, 172 (2d Cir. 2021).

When deciding a Rule 12(b)(1) motion at the pleading stage, the court "must accept as
true all material facts alleged in the complaint and draw all reasonable inferences in the
plaintiff's favor," except for "argumentative inferences favorable to the party asserting
jurisdiction." <u>Buday v. N.Y. Yankees P'ship</u>, 486 F. App'x 894, 895 (2d Cir. 2012) (summary
order).  To the extent a Rule 12(b)(1) motion places jurisdictional facts in dispute, the district
court may resolve the disputed jurisdictional fact issues by referring to evidence outside the
pleadings.  <u>Amidax Trading Grp. v. S.W.I.F.T. SCRL</u>, 671 F.3d 140, 145 (2d Cir. 2011).

In addition, when a defendant moves to dismiss for lack of subject matter jurisdiction and
on other grounds, the court should consider the Rule 12(b)(1) challenge first.  <u>Rhulen Agency,</u>
<u>Inc. v. Alabama Ins. Guar. Ass'n</u>, 896 F.2d 674, 678 (2d Cir. 1990).

B.      <u>Rule 12(b)(6)</u>

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative
complaint under "the two-pronged approach" articulated by the Supreme Court in <u>Ashcroft v.</u>
<u>Iqbal</u>, 556 U.S. 662, 679 (2009).  First, a plaintiff's legal conclusions and "[t]hreadbare recitals
of the elements of a cause of action, supported by mere conclusory statements," are not entitled
to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  <u>Id</u>. at 678;
<u>Hayden v. Paterson</u>, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded
factual allegations, a court should assume their veracity and then determine whether they
plausibly give rise to an entitlement to relief."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard
of "plausibility."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,

557 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

II.    Jurisdiction Over ICE's Transfer Decisions

The Federal Defendants argue the transfers of Molina and Palacios were subject to

DHS's statutory discretion and, therefore, fall within the Immigration and Nationality Act's

("INA") "jurisdiction-stripping provision."  (Doc. #39 at 8).  For similar reasons, they also argue

plaintiffs' APA claim challenging those transfers is barred by sovereign immunity.

The Court disagrees.

A.    INA Jurisdiction-Stripping Provision

1.    Legal Standard

Section 1252(a)(2)(B)(ii) of the INA provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), . . . and
> regardless of whether the judgment, decision, or action is made in removal
> proceedings, no court shall have jurisdiction to review . . . any . . . decision or
> action of the Attorney General or the Secretary of Homeland Security the authority
> for which is specified under this subchapter to be in the discretion of the Attorney
> General or the Secretary of Homeland Security, other than the granting of relief
> under section 1158(a) of this title [dealing with asylum].

8 U.S.C. § 1252(a)(2)(B)(ii).

A decision is "in the discretion of the Attorney General or the Secretary,"[12] and therefore

is not reviewable by a federal court pursuant to Section 1252(a)(2)(B)(ii), if the statute

authorizing the Secretary to make the determination includes "language specifically rendering

---

[12]    References to the Attorney General in the INA are "deemed to refer to the Secretary" of
DHS.  6 U.S.C. § 557; see also id. § 271(b)(5).

that determination to be within his discretion (e.g., 'in the discretion of the Attorney General [or Secretary],' 'to the satisfaction of the Attorney General [or Secretary],' etc." Nethagani v. Mukasey, 532 F.3d 150, 153–55 (2d Cir. 2008).

"'Specified' is not synonymous with 'implied' or 'anticipated.'" Kucana v. Holder, 558 U.S. 233, 243 n.10 (2010).  Thus, if a statute "authorizes the [Secretary] to make a determination," but does not include language explicitly granting discretion to do so, "the decision is not one that is 'specified to be in the discretion of the [Secretary]' for purposes of § 1252(a)(2)(B)(ii)."  Nethagani v. Mukasey, 532 F.3d at 154–55; see also Reyna ex rel. J.F.G. v. Hott, 921 F.3d 204, 209 (4th Cir. 2019) (concluding that "discretionary authority may not be implied" for purposes of Section 1252(a)(2)(B)(ii), "it must be explicitly conferred in the statute").

Thus, whether Section 1252(a)(2)(B)(ii) strips courts of jurisdiction to review a decision by the Secretary does not turn on whether the challenged decision "require[s] an exercise of discretion," as most decisions by the Secretary "probably do."  Nethangani v. Mukasey, 532 F.3d at 154.  Rather, it depends on "whether the text of the [applicable] subchapter" granting the Secretary decision-making authority "'specifies' that the 'decision' is 'in the discretion of the [Secretary].'"  Id.

This narrow construction aligns with "the presumption favoring judicial review of administrative action."  Kucana v. Holder, 558 U.S. at 251.  As the Supreme Court has instructed, "[w]hen a statute is reasonably susceptible to divergent interpretation," courts should "adopt the reading that accords with traditional understandings and basic principles:  that executive determinations generally are subject to judicial review."  Id.  This is particularly true in

the immigration context and in "questions concerning the preservation of federal-court jurisdiction." Id.

    2.   <u>Analysis</u>

The Federal Defendants read Section 1231(g)(1) of the INA as conferring on the Secretary unreviewable discretionary authority to transfer noncitizen detainees.

Section 1231(g)(1) of the INA provides:

> <u>The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal</u>.  When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service—Salaries and Expenses", without regard to section 6101 of title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

8 U.S.C. 1231(g) (emphasis added).

Contrary to the Federal Defendants' construction, the plain text of Section 1231(g) does not provide the Secretary with specific discretion to transfer alien detainees.  Therefore, Section 1252(a)(2)(B)(ii) does not strip this Court of jurisdiction to hear plaintiffs' claims concerning Molina's and Palacios's transfers to out-of-state facilities.[13]

Section 1231(g) provides the Secretary "shall arrange for appropriate places of detention

---

[13]    Because the Court concludes Section 1231(g) does not trigger the INA's jurisdiction-stripping provision, the Court need not address the Federal Defendants' argument that Section 1252(a)(2)(D) prohibits plaintiffs from bringing their constitutional claims in this Court.  First, Section 1252(a)(2)(D) only applies when the INA "limits or eliminates judicial review," which, as explained above, is not the case here.  8 U.S.C. § 1252(a)(2)(D).  Second, plaintiffs' claims challenge their conditions of detention pending removal proceedings, not a removal order. Therefore, Section 1252(a)(2)(D) is inapplicable.  <u>See</u> <u>Delgado v. Quarantillo</u>, 643 F.3d 52, 55 (2d Cir. 2011) (citing <u>Kellici v. Gonzales</u>, 472 F.3d 416, 420 (6th Cir. 2006)); <u>see also</u> <u>Xiu Qing You v. Nielsen</u>, 321 F. Supp. 3d 451, 459 (S.D.N.Y. 2018) (rejecting argument that district court could not review constitutional claims brought by pretrial immigration detainee stemming from his arrest and detention in ICE custody).

for aliens," and may expend monies to acquire land and build or repair facilities when existing "facilities are unavailable."  Thus, "the language of § 1231(g) does not address transfers at all, nor does it explicitly grant the Attorney General or the Secretary of Homeland Security discretion with respect to transfers."  Reyna ex rel. J.F.G. v. Hott, 921 F.3d at 209 (Sections 1252(a)(2)(B)(ii) and 1231(g) did not strip federal courts of jurisdiction to review detainee transfers that allegedly violated the detainees' constitutional rights); see also Aguilar v. U.S. Immigr. & Customs Enf't, 510 F.3d 1, 20 (1st Cir. 2007) (same).  Instead, Section 1231(g) "appears to relate more centrally to the government's brick and mortar obligations for obtaining facilities in which to detain aliens."  Reyna ex rel. J.F.G. v. Hott, 921 F.3d at 209.

The Federal Defendants rely on Wood v. United States, 175 F. App'x 419, 420 (2d Cir. 2006) (summary order), and a succeeding line of cases as authority suggesting the Secretary has discretion over individualized detainee transfers.  However, in Wood, the Second Circuit did not consider whether it had jurisdiction to review the Secretary's decision to transfer the plaintiff; rather, the Circuit assumed it had jurisdiction over the case and determined, on the merits, that "[t]he Attorney General was not required to detain Wood in a particular state" pursuant to Section 1231(g).  Id.  And, as discussed above, the relevant question for purposes of Section 1252(a)(2)(B)(ii) is not whether the Secretary has exercised discretion, but whether the statute's language confers specific discretion to the Secretary.  Accordingly, Wood is inapposite.

Likewise, the cases cited by the Federal Defendants in which courts determined they lacked jurisdiction to enjoin all future transfers of an immigration pretrial detainee while the detainee's habeas petition was pending are also inapposite, because they are both factually and legally dissimilar to the instant case.  In those cases, the plaintiffs alleged their underlying detention was unconstitutional, and they wanted to avoid transfer while seeking habeas relief; in

14

contrast, the plaintiffs here allege the transfers themselves were a form of unconstitutional retaliation.  See, e.g., P.M. v. Joyce, 2023 WL 2401458, at *5–6 (S.D.N.Y. Mar. 8, 2023); Mathurin v. Barr, 2020 WL 9257062, at *11 (W.D.N.Y. Apr. 15, 2020); Gomez v. Whitaker, 2019 WL 4941865, at *6 (W.D.N.Y. Oct. 8, 2019).  Cf. Salazar v. Dubois, 2017 WL 4045304, at *1 (S.D.N.Y. Sept. 11, 2017) (concluding that "without a showing that a transfer would infringe on Salazar's constitutional rights, this Court does not have authority to issue an order to change or keep Salazar at any particular location").

Accordingly, Section 1252(a)(2)(B)(ii) of the INA does not strip the Court of jurisdiction to hear plaintiffs' claims concerning Molina's and Palacios's transfers to out-of-state facilities, and the Court will not dismiss plaintiffs' claims on that ground.

B.    Sovereign Immunity

Defendants DHS and ICE argue plaintiffs' APA claim is barred by sovereign immunity because Section 1252(a)(2)(B)(ii) of the INA precludes judicial review of detainee transfers and because detainee transfers are committed to agency discretion by law.

The Court disagrees.

Section 702 of the APA waives sovereign immunity for actions "seeking relief other than money damages" brought against the United States by a person "suffering legal wrong because of agency action."  5 U.S.C. § 702.  However, this waiver of sovereign immunity does not apply to the extent a statute "preclude[s] judicial review" of the relevant claim, or if the challenged "agency action is committed to agency discretion by law."  Id. § 701(a).  An action is "committed to agency discretion by law" only when "the statute or regulation said to govern the challenged agency action is drawn so that a court would have no meaningful standard against

which to judge the agency's exercise of discretion." Chen v. Garland, 43 F.4th 244, 252 (2d Cir. 2022).

As discussed above, Section 1252(a)(2)(B)(ii) of the INA does not preclude judicial review of plaintiffs' APA claim.

Moreover, even if detainee transfers were a type of agency action "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), plaintiffs' claims would still be subject to judicial review in this case.  "[I]f [an agency] announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that" policy is subject to review by courts as potentially "arbitrary, capricious, or an abuse of discretion within the meaning of the" APA.  I.N.S. v. Yueh-Shaio Yang, 519 U.S. 26, 32 (1996).  Here, plaintiffs claim ICE and DHS violated two specific ICE policies in transferring Molina and Palacios.  Each of these policies is alleged to include enumerated requirements ICE and DHS must follow when transferring detainees.

In other words, even if the INA did grant the Secretary unfettered discretion to transfer noncitizen detainees in the first instance, DHS and ICE have adopted self-imposed rules that limit the exercise of that discretion.  If, as plaintiffs allege, ICE and DHS disregarded those limits, plaintiffs' claims fall within the APA's waiver of sovereign immunity and are subject to judicial review.  See Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons, 954 F.3d 118, 130 (2d Cir. 2020) (noting "the APA provides aggrieved parties with a cause of action to enforce an agency's duty to adhere to its own rules").

Accordingly, plaintiffs' APA claim against DHS and ICE may proceed.

III.   <u>First Amendment Retaliation Claim</u>

The Federal Defendants argue plaintiffs' First Amendment retaliation claim against them must be dismissed because plaintiffs fail to allege any adverse actions were taken by the Federal Defendants (as opposed to the Orange County Defendants), or that any adverse actions were causally related to plaintiffs' engagement in protected activity.[14]

The Court disagrees.

A.   Legal Standard

To adequately plead a First Amendment retaliation claim, a plaintiff must plausibly allege (i) he engaged in constitutionally protected speech or conduct, (ii) a defendant took adverse action against him, and (iii) the protected speech and adverse action are causally connected.  Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015).

As to the first element, "the filing of prison grievances is a constitutionally protected activity."  Davis v. Goord, 320 F.3d 346, 352–53 (2d Cir. 2003).  So too are "[t]he rights to complain to public officials and to seek administrative and judicial relief."  Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994).

As to the second element, an "adverse action" is "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  Davis v. Goord, 320 F.3d at 353.  For example, a transfer of a prisoner made solely in retaliation for the exercise of constitutionally protected rights is an adverse action.  See Meriwether v. Coughlin, 879 F.2d 1037, 1046 (2d Cir. 1989).  Moreover, a law enforcement officer "who fails to intercede" in the violation of an individual's constitutional rights "is liable

---

[14]   Plaintiffs seek only declaratory relief and, with respect to plaintiffs still detained in segregated confinement or in facilities outside New York state, injunctive relief regarding the First Amendment claim against the Federal Defendants.  (Compl. at 41–42).

for the preventable harm caused by the actions of other officers." <u>Terebesi v. Torreso</u>, 764 F.3d 217, 243 (2d Cir. 2014).

Finally, as to the third element, a plaintiff must allege a causal connection between the protected speech and the adverse action. <u>Dolan v. Connolly</u>, 794 F.3d at 294.  To sufficiently allege a causal connection, the plaintiff's "allegations must support an inference that the protected conduct was a substantial and motivating factor for the adverse action[]." <u>Dorsey v. Fisher</u>, 468 F. App'x 25, 27 (2d Cir. 2012) (summary order).  "Courts may infer a retaliatory motive from a variety of factors, including the timing" of the alleged retaliatory action and its "temporal proximity" to the initial grievance or complaint.  <u>Mateo v. Bristow</u>, 2013 WL 3863865, at *6 (S.D.N.Y. July 16, 2013).  There is no "bright line" for establishing temporal proximity, but a window of up to eight months between the speech and the adverse action is sufficiently close to support an inference of a causal connection, depending on the circumstances.  <u>Burton v. Lynch</u>, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009).

B.    <u>Analysis</u>

The Federal Defendants do not dispute plaintiffs engaged in protected activity or suffered adverse actions at the hands of the Orange County Defendants.[15]  They dispute, however, that any adverse actions were committed by the Federal Defendants or were caused by plaintiffs' protected speech.

The Federal Defendants' motion presents a close call.  However, at this early stage, drawing all reasonable inferences in plaintiffs' favor, the Court concludes plaintiffs have pleaded

---

[15]    The Orange County Defendants, who do not join the instant motion and instead answered the complaint, dispute these contentions.  (<u>See</u> Doc. #40).

facts from which it is reasonable to infer the Federal Defendants had a role in, or could have but failed to prevent, unconstitutional retaliation against plaintiffs.

For example, on February 17, 2022, plaintiffs allege ICE Officer Flynn was present when OCJ guards allegedly (i) placed Moscoso, Molina, Gonzalez, Lopez, and Palacios in segregated confinement, (ii) conducted a mass search of their cells, confiscating and discarding personal property, and (iii) threatened additional sanctions if the hunger strike continued.  The following day, plaintiffs allege OCJ guards issued disciplinary citations to Moscoso, Molina, Gonzalez, Lopez, and Palacios in the presence of ICE officials.  Plaintiffs also allege ICE Director Almodovar told Molina, Gonzalez, Lopez, Moscoso, and Palacios she would address the hunger strikers' demands, return their personal belongings, and restore tablet access if they ended the strike.  The alleged conversation with ICE Director Almodovar, construed in plaintiffs' favor, implies that Almodovar, as an ICE official, had sufficient authority over the conditions plaintiffs faced at OCJ to actually deliver on these promises.

In addition, ICE Officer Flynn allegedly told Lopez, Moscoso, and Ortiz that he would "try to solve the situation" after they were moved to D1 Unit.  (Compl. ¶ 111).  Plaintiffs have also alleged ICE effectuated the transfer of Molina and Palacios to detention centers in other states.

Several of these adverse actions are alleged to have occurred as the hunger strike was ongoing.  And although the transfers to D1 Unit and to facilities in other states occurred five months after the hunger strike, the Court disagrees that, in these circumstances, five months is too long a period to infer the transfers were substantially motivated by the plaintiffs' engagement in protected conduct.  See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (concluding the "passage of only six months" between protected conduct and the alleged retaliatory actions was

"sufficient to support an inference of a causal connection").  Moreover, Gonzalez and Ortiz continued to make complaints about the conditions at OCJ directly to DHS as late as April 2022, only three months before the alleged retaliatory transfers.  And Orange County Defendant Jones allegedly told the press that these actions, which plaintiffs have alleged ICE officials were present for, were punishment for the detainees rejecting food.  Drawing all reasonable inferences in plaintiffs' favor, the circumstances detailed in the complaint are sufficient to allege the adverse actions were causally connected to plaintiffs' constitutionally protected conduct.

These allegations must be considered, as well, within the context of the alleged contractual relationship between ICE and OCJ.  In the complaint, plaintiffs refer to ICE detention standards and certain ICE policies that would preclude the retaliatory actions alleged here.  Plaintiffs also allege the contract between ICE and OCJ requires ICE to provide express authorization for the transfer of any person detained pursuant to the contract.  Thus, the Court can reasonably infer, assuming the truth of plaintiffs' allegations, that the Federal Defendants had at least a "realistic opportunity" to prevent the alleged retaliatory actions.  See Terebesi v. Torreso, 764 F.3d at 244 ("Whether the officer had a realistic opportunity to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Accordingly, plaintiffs' First Amendment retaliation claim against the Federal Defendants may proceed.

**CONCLUSION**

The motion to dismiss is DENIED.

By January 24, 2024, the Federal Defendants shall file an answer to the complaint.

By separate Order, the Court will schedule an initial conference.

The Clerk is instructed to terminate the motion.  (Doc. #38).

Dated: January 10, 2024
       White Plains, NY

                         SO ORDERED:

                         _____
                         Vincent L. Briccetti
                         United States District Judge